IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 2, 2024

**STATE OF TENNESSEE v. GERALD MYERS**

**Appeal from the Circuit Court for Dyer County**
**No. 22-CR-136     Mark L. Hayes, Judge**

———————————————————

**No. W2023-00771-CCA-R3-CD**

———————————————————

A Dyer County jury found the Defendant, Gerald Myers, guilty of attempted second degree murder and employing a firearm during the commission of a dangerous felony. On appeal, the Defendant asserts that there is insufficient evidence to support his convictions because he acted in self-defense. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Andrew T. Cook, Tiptonville, Tennessee, for the appellant, Gerald Myers.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; and Danny H. Goodman, Jr., District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant shooting the victim, Thomas Pugh. On April 6, 2021, Mr. Pugh dropped off a dog kennel at the Defendant's residence. After spending about an hour and a half talking with the Defendant, the victim walked out to his truck to leave. The Defendant followed and opened fire on the victim, shooting him multiple times. For his role in these events, the Dyer County grand jury indicted the Defendant for attempted first degree premeditated murder resulting in serious bodily injury and for employing a firearm during the commission of a dangerous felony.

At trial, the State presented the testimony of six witnesses, most of whom were law enforcement officers who had responded to the scene after a neighbor called 9-1-1. The

Defendant and a friend testified for the defense. We summarize the testimony at trial as follows.

The victim and the Defendant had known each other since childhood, and the victim considered the Defendant a friend. Over the years, the two had done "a little bit of work together on houses," but had never had "any problems." At around 7:30 p.m. on April 6, 2021, the victim went to the Defendant's residence on Charles Moore Road in Newbern, Tennessee. The Defendant had acquired a litter of puppies, so the victim brought the Defendant a kennel he had offered to loan the Defendant to contain the puppies. He also planned to take a puppy home with him. When the victim arrived, the Defendant was "pretty intoxicated." The victim stayed and talked with the Defendant about an hour and a half, and the men drank a few beers during that time. At around 9:00 or 9:30 p.m., the victim prepared to leave, taking the puppy he had selected from the litter. The victim did not have a weapon with him or in the truck he had driven to the Defendant's house.

The victim placed the puppy in the truck. As he walked toward the tailgate of his truck, he noticed the Defendant exiting the back door of his house. It was dark, but the victim could see that the Defendant held something in his hand as he walked toward the victim. The victim was standing in the roadway on the driver's side of the truck when he realized the Defendant was carrying a rifle. The victim asked the Defendant, "What are you doing with the - -", but before he could complete the sentence, the Defendant raised the rifle and fired. The bullet went through the victim's right leg and hit his left leg. The victim fell to the ground and when he looked up, the Defendant was walking toward the victim and firing the rifle. The gunfire went over the victim, and he moved to the front of the truck. The victim described their movement as "kind of a cat and mouse . . . game" with the two men circling the truck and the victim using the truck as a shield against the bullets.

As the victim tried to evade the Defendant's gunfire, he realized blood was filling his boot and that he was dragging his leg. The Defendant came around the front of the truck, pointed the barrel of the gun at the victim and attempted to fire the gun, but "it went, 'click.'" While the Defendant cleared the gun, the victim ran. As he fled, the Defendant began firing again and shot the victim in the hip and the buttocks. The victim continued to hear the report of the rifle, so he assumed the Defendant was chasing him. The Defendant shot the victim three times in total.

The victim ran to the closest neighbor's house and knocked on the window between the garage and the house. The neighbor opened the window and told the victim to get off his property, so the victim ran to the next house. It was about this time that the Sheriff's deputies arrived. The victim lay on the ground, shielded by a deputy's car, hyperventilating. The victim thought he told the deputies the Defendant had shot him, but

he was not sure. As he lay on the ground, he was terrified, believing he was going to die. An ambulance arrived, and the victim began to experience burning sensations. He was transported by a medical flight team to Cape Girardeau and then airlifted to St. Louis for medical treatment. He was hospitalized for four days.

At the time of trial, one of the bullets remained lodged in the victim's hip and was inoperable. The victim continued to have pain related to his gunshot injuries. The victim denied having any type of disagreement or altercation with the Defendant the night of the shooting. He further denied trying to take any property from the Defendant that night. When asked why he thought the Defendant shot him, the victim said, "I don't have any idea what brought it on, it was a surprise to me."

On cross-examination, the victim agreed that he had pleaded guilty to theft of property valued under a thousand dollars in January 2022. The victim admitted that following the shooting he had stopped using pain pills, but used methamphetamine as a substitute. He agreed that he had a court case in Dyer County pending with respect to this issue. The victim agreed that, at the time of the shooting, he had recently purchased a 410 Long Colt and that the Defendant was aware that the victim owned this gun.

Dyer County Sheriff's Office ("DCSO") Lieutenant Michael Walker responded to a shooting on Charles Moore East in Dyer County, Tennessee. Lieutenant Walker was approximately a mile and a half away when dispatch notified him of the report. He responded immediately and arrived in two to three minutes. When he arrived, he saw a man standing in the road. Initially, he thought the man was the shooter, but it was the neighbor who had called 9-1-1. The neighbor directed the lieutenant's attention to a residence where the victim stood in the doorway. Lieutenant Walker recognized the victim, having "dealt with [him] before," who came running toward Lieutenant Walker and fell a few feet in front of him. The victim told Lieutenant Walker that the Defendant had shot him. Lieutenant Walker asked where the Defendant was, and the victim pointed east toward Highway 211. Lieutenant Walker did not see anyone in the direction the victim pointed, but he dragged the victim behind a car to assess the victim's injuries.

Another deputy arrived, requested medical help, and then began setting a perimeter around the residence on Charles Moore East. Two residents of the area drove up trying to access their home. When law enforcement advised the area was closed for a crime scene, the individuals identified themselves as paramedics and rendered aid to the victim. Meanwhile other deputies arrived, and the Sheriff had arranged for an individual to make phone contact with the Defendant. Through this individual, the Sheriff advised the Defendant to step into the middle of the roadway where deputies took him into custody. Lieutenant Walker was present and did not see any injuries to the Defendant at the time.

On cross-examination, Lieutenant Walker testified that he did not attempt to assess the Defendant while they were taking him into custody or attempt to enter the Defendant's house. Lieutenant Walker recognized the victim from past cases involving domestic abuse and DUI. Lieutenant Walker did not recall the date of either of those incidents but agreed that it was "a long time ago."

DCSO Investigator Matthew Carson reported to the crime scene and assisted in looking for the firearm in question and gathering and labeling evidence. Investigator Carson collected ten Winchester Super-X .22 Long Rifle shell casings consistent with the type of ammunition used in the crime weapon, a Ruger 10/22, semi-automatic rifle. The shell casings were found in the roadway around the victim's S-10 truck. The location of the shell casings around the truck indicated to Investigator Carson that the shooter was moving while he fired the gun. Investigator Carson also collected a Winchester Super-X .22 Long Rifle round that was unfired in the grass near the truck. He noted that there was a "primer strike" on the back of the shell casing indicative of an unsuccessful attempt to fire the round. Investigator Carson explained the process that occurs when a round does not fire. He stated that the shooter will "grab [the bolt catch], pull all the way [toward the shooter], and release it." The round should eject, and a new round will be moved into the chamber.

Investigator Carson located the rifle used in the shooting underneath a "broken down" truck behind the residence. The rifle had one round in the chamber and was a Ruger 10/22 with a wood stock, stainless barrel, and a stainless scope. The weapon had a 25-round Ruger magazine with ten rounds loaded. Inside the Defendant's residence, law enforcement collected Winchester Super-X ammunition, the same type of ammunition recovered at the scene and in the rifle.

Investigator Carson identified items collected from the Defendant at the crime scene which included a wallet, $126.00, and a cell phone. At the jail, an additional one-dollar bill and a twenty-dollar bill were found in the Defendant's pocket.

DCSO Investigator Jeremy Caldwell served as the lead investigator in this case and participated in clearing the Defendant's residence. After determining no one else was present in the Defendant's residence, Investigator Caldwell spoke with the Defendant. During his interaction with the Defendant, Investigator Caldwell observed indicators of intoxication. The Defendant's speech was slurred, he had the odor of alcohol on him, and the Defendant had trouble sitting upright in the backseat of Sergeant Flora's patrol car. Investigator Caldwell asked the Defendant "where the gun was." He explained that he inquired about the gun because he did not want a child to find an unattended weapon. In response, the Defendant "looked in the general area where [the gun] was located, but he never told [Investigator Caldwell] where the gun was."

The Defendant told Investigator Caldwell that the victim tried to rob him. Law enforcement, however, found no indication of a robbery at the crime scene. There were no signs of forced entry to the Defendant's residence, the Defendant had his wallet, cash, and credit/debit cards. The Defendant never indicated to any deputy that the victim had a gun. Law enforcement officers searched the victim's vehicle and found only a puppy on the floorboard in front of the driver's seat. Deputies found no weapons in the victim's truck; however, two .22 caliber lead projectiles were recovered from the middle portion of the "B Pillar" on the passenger side of the victim's truck.

The victim's vehicle was sitting in the roadway facing westbound in front of the Defendant's house. The driver's side tires were on the road and the passenger side tires were on the grass. There were droplets of blood in two areas of the road in front of the Defendant's driveway, all of which were within ten to fourteen feet of the victim's truck. Investigator Caldwell observed more blood droplets in the grass trailing westbound along the road toward the house from where the 9-1-1 call originated and where law enforcement found the victim.

Investigator Caldwell went inside the Defendant's house and described it as being a "mess" as a result of the "living conditions" and not the result of a crime. In the kitchen, Investigator Caldwell observed a few drops of blood on the kitchen counter, the stove, and the kitchen floor. The amount of blood was minimal; however, Investigator Caldwell noticed that the Defendant's lip was "busted" and there was "a little bit of blood" on his shirt. Investigator Caldwell characterized the lip injury as "minor."

The victim's truck was towed to the Sheriff's Office impound lot. At the impound lot, Investigator Caldwell observed six gunshot defects to the truck. Based upon the location of these defects, Investigator Caldwell determined that the gun was fired at the truck from different angles, but all came from the driver's side of the truck.

The victim was transported to a hospital in St. Louis, so Investigator Caldwell interviewed the victim over the phone rather than in person.

On cross-examination, Investigator Caldwell testified that the victim was "hit in the leg with the first shot on the driver's side" and then the victim fell to the ground. The investigation revealed that the first shot was likely fired from the back of the truck on the driver's side. The bullet from the first shot grazed the victim's calf on one leg and then entered the shin area of the other leg. The victim used the truck as cover, resulting in the bullets creating defects to the truck, originating from the driver's side toward the passenger side. In other words, the Defendant was shooting through the truck toward the victim who was using the truck as cover.

About the drops of blood inside the Defendant's residence, Investigator Caldwell agreed that those droplets could have indicated the possibility of an altercation inside the Defendant's residence or that the Defendant "was so intoxicated he fell and busted his own lip." Investigator Caldwell confirmed his earlier testimony that the Defendant stated that someone tried to rob him; however, he stated that the evidence at the scene did not support the conclusion that the Defendant was assaulted. Rather, the evidence indicated that the Defendant shot the victim without provocation.

On redirect examination, Investigator Caldwell testified that the Defendant never called the police reporting an assault.

When DCSO Sergeant Jake Flora arrived on the scene, Lieutenant Walker was assessing the victim who was lying behind the vehicles. Sergeant Flora, along with several other officers, drove in a sheriff's truck to the Defendant's residence. The Defendant walked outside the house where they placed him in custody. Sergeant Flora did not recall any injuries to the Defendant at the time of his arrest. The Defendant stated that he was "being robbed, or it was self-defense." Sergeant Flora assisted in clearing the Defendant's residence and wore a body camera during the sweep. The State showed the jury the body camera video footage. Sergeant Flora transported the Defendant to jail. As part of that process, he collected from the Defendant a cell phone and a wallet containing $126.00 and a Region's Bank Card.

DCSO Chief Investigator Jerry McCreight interviewed the Defendant the day after the shooting at the Sheriff's Office. During the recorded interview, the Defendant told Chief Investigator McCreight that he was knocked down; however, Chief Investigator McCreight did not observe any injuries consistent with the Defendant's statement. About the shooting, the investigator asked the Defendant, "Did you just lose your temper," and the Defendant responded in the affirmative.

The defense presented the testimony of Ella Lou Eckland and the Defendant. Ms. Eckland had known the Defendant for seventeen years. Ms. Eckland spent the day with the Defendant on April 6, 2021. They ran errands together, ate, and then picked up Ms. Eckland's grandson from school. The Defendant went home with Ms. Eckland and stayed for several hours before Ms. Eckland drove the Defendant home at around 7:30 p.m. She helped the Defendant unload his purchases from the day and then left, noting that the Defendant had bought two 30-packs of beer and cigarettes but had only opened one beer. She described the Defendant as being in a good mood when she left him.

The Defendant testified that he agreed with "a lot" of the victim's testimony. The Defendant, other than several domestic charges involving his ex-wife, had "never been in

trouble with the law before." He knew the victim carried guns, but the two men had always been friends. Defense counsel asked the Defendant a line of questioning about the victim's guns and as the Defendant tried to recall, he said, "I really wasn't - - it's almost like I was drugged that night. I don't know why, but I know I - - but, looking at that video, I know I had to have a concussion, because I was somewhere midway between understanding . . . and semi-conscious."

The Defendant did not recall going out to the victim's car on the night of the shooting, saying "[i]t's all foggy, really." Shortly after Ms. Eckland left, the victim arrived. The Defendant denied being intoxicated when the victim arrived. The two men talked in the kitchen while having "a drink." The victim selected a puppy from the Defendant's litter of puppies and then the victim "walked out." The Defendant went to his bedroom. The Defendant then stated that when he walked out of his bedroom, he "fell to the ground, kicked in the face, I don't know; it all goes foggy there. I can't sit here and elaborate on it because I don't know." The Defendant then confirmed that he was assaulted. Upon further questioning by defense counsel, he agreed that he was hit in the head and jaw and sustained a cut to his ear and was rendered unconscious. The Defendant could offer no explanation for why he would have been assaulted in his home, but he was terrified that he was going to die.

When the Defendant became conscious, his greatest concern was that the victim had gone to get his gun and would be returning. He did not know whether the victim had a gun that night, but he had known him to carry a gun in the past. The Defendant had no idea why the victim would have assaulted him. The Defendant denied trying to kill the victim. He explained that he had military experience, and he had hunted since he was ten years old. He described himself as "a very good marksman."

On cross-examination, the Defendant testified that he was "walking to the kitchen; I was going to get something to eat. Staggering my way - - it all went black --." When asked who hit him, he replied, "I don't know." When asked if he could have fallen, the Defendant stated that he could not have fallen based upon the severity of his injuries. The Defendant agreed that he did not see the victim with a gun. The Defendant stated that he kept his gun in his bedroom and that he would have had to retrieve the gun from the bedroom before taking it outside to the victim's truck. The Defendant explained that he did not call 9-1-1 because the events happened "instantaneous," and he did not have his phone with him. As to why he did not lock the door to his house to protect himself, the Defendant described the moment as "fight or flight," eliminating the time to make decisions.

The Defendant had little recollection of what occurred between him and the victim outside his house, but he stated that he would have tried to prevent the victim from getting

into his truck. He continued firing at the victim, after he shot him initially, to continue to prevent him from entering his truck. He agreed the victim used the truck as a cover to avoid being shot, but he noted that the victim was also trying to get in the truck.

The Defendant denied hiding his gun under a truck, but he could offer no explanation for how the gun ended up under the truck following the shooting. He maintained that he was "dazed and confused" and "in shock," rendering him unable to formulate a plan to hide evidence.

On redirect examination, the Defendant testified that he did not know what happened outside his house near the victim's truck.

After hearing this evidence, the jury convicted the Defendant of the lesser included offense of attempted second degree murder and employing a firearm during the commission of a dangerous felony. The trial court ordered consecutive sentences of eight years for the murder conviction and six years for the employing a firearm during a dangerous felony conviction. It is from these judgments that the Defendant appeals.

## II. Analysis

The Defendant asserts that the evidence was insufficient to support his convictions. He argues that the Defendant's actions were the result of an attack and thus he justifiably acted in self- defense and had the right to use force. He maintains that the evidence at trial established that he acted in self-defense and that the State failed to prove that he did not act in self-defense. The State responds that the evidence is sufficient to support the Defendant's convictions for attempted second degree murder and employing a firearm in the commission of a dangerous felony.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with

innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

## A. Attempted Second Degree Murder

"Second degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b).

"A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or . . . acts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(2)-(3). To constitute a substantial step, a person's entire course of action must be corroborative of the intent to commit the offense. T.C.A. § 39-12-101(b).

The evidence, viewed in the light most favorable to the State, showed that the Defendant followed the unarmed victim out to his truck at night and began firing a rifle at him. The first bullet struck the victim and knocked him to the ground, but the Defendant continued moving toward the victim and firing his rifle. The victim hid, using the truck as a shield, as the Defendant repeatedly fired at the truck while moving around the truck in a "cat and mouse" game with the victim. When the Defendant finally reached the victim, his rifle misfired. While the Defendant ejected the bullet that misfired, the victim fled toward the nearest neighbor's house. As the victim ran down the road, the Defendant, having cleared the misfired bullet, began firing at the victim again, striking the victim twice in the hip and the buttocks. The victim ran to the nearest neighbor's house and hid. The Defendant hid the crime weapon, but upon questioning by police, looked in the direction of the truck where the gun was hidden. In response to police questioning, the Defendant agreed that he "lost his temper." The location of the spent shell casings, blood on the road, and misfired bullet recovered at the crime scene were consistent with the victim's account of the events. This is evidence upon which any rational juror could have found, beyond a reasonable doubt, that the Defendant knowingly attempted to kill the victim. The Defendant is not entitled to relief as to this issue.

## B. Employing a Firearm in the Commission of a Dangerous Felony

It is an offense to employ a firearm during the commission of a dangerous felony or the attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b)(1), (2). Thus, in this case, the State had to prove that the Defendant employed "[a]ny weapon that will or is designed to . . . expel a projectile by the action of an explosive," during an attempt to commit second degree murder, a Class B felony. T.C.A. § 39-11-106(13(A)(i).

The evidence, viewed in the light most favorable to the State, showed that the Defendant, armed with a Ruger 10-22 semi-automatic rifle, followed the victim to his car in the dark and began shooting at the victim, striking him three times. The Defendant continued firing at the victim until the victim ran to a neighboring house and hid. This is sufficient evidence upon which any rational juror could find, beyond a reasonable doubt,

that the Defendant employed his rifle during the commission of or attempt to commit second degree murder, a dangerous felony. The Defendant is not entitled to relief as to this issue.

### C. Self-Defense

The Defendant's central argument as to insufficiency of the evidence is that he acted in self-defense and that the State failed to prove otherwise. The Defendant does not challenge the sufficiency of the evidence regarding any other element of the offenses. The State responds that the evidence was sufficient for a rational trier of fact to find that Defendant did not act in self-defense. We agree with the State.

The defense of self-defense is expressly provided for in Tennessee by statute and defined, in relevant part, as follows:

> (b)(1) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.
>
> > (2) . . . [A] person who is not engaged in conduct that would constitute a felony or Class A misdemeanor and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
> >
> > > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury,
> > >
> > > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> > >
> > > (C) The belief of danger is founded upon reasonable grounds.

T.C.A. § 39-11-611(b). A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to justify his conduct.

It is well-established "that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)). Moreover, "[t]he [S]tate has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense." *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996), *overruled on other grounds by State v. Williams*, 977 S.W.2d 101 (Tenn. 1998); T.C.A. § 39-11-201(a)(3). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

Viewing the evidence in the light most favorable to the State, the evidence was sufficient for a rational juror to determine that the Defendant did not act in self-defense. The victim was essentially paying a social visit to the Defendant. According to both parties, there were no arguments or disagreements. The Defendant did not see a gun on the victim nor did the police find one on the victim or in the victim's truck. The Defendant followed the victim out to his truck and opened fire on him. The victim moved around the truck to shield himself, and the Defendant followed the victim continuing to fire his rifle at the victim. Even as the victim ran away from the Defendant down the road, the Defendant continued to fire at the back of the fleeing victim. The Defendant claimed he was in fear for his safety inside his house, but instead of securing himself inside the house, he went after the victim. Further, the Defendant made no attempts to seek help from law enforcement for his safety or medical help for the victim. Though the Defendant claimed that the victim tried to rob him, law enforcement found no indication of a robbery. Also, the Defendant admitted to Chief Investigator McCreight that he lost his temper. The Defendant testified that he acted in self-defense, and the jury clearly rejected this claim, as was their prerogative. *Bland*, 958 S.W.2d at 659. The evidence was sufficient for a rational juror to decide that the Defendant did not act in self-defense when he chased the victim down the road shooting at the victim as he fled. The Defendant is not entitled to relief.

### III. Conclusion

For the foregoing reasons, the trial court's judgments are affirmed.

_____

ROBERT W. WEDEMEYER, JUDGE

- 12 -